UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
JAMES SINATRA,                               \*
    Plaintiff.                             \*
                                            \*
v.                                           \*     Civil Action No. 04-11077 NG
                                            \*
BOSTON TOWING AND                            \*
TRANSPORTATION CO.,                          \*
Owner of TUG ETHEL TIBBETTS, and             \*
CYPRESS POINT SHIPPING, LTD.,                \*
Owner of the TANKER MOUNTAIN LADY,           \*
    Defendants.                             \*
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SINATRA'S OPPOSITION TO BOSTON TOWING AND TRANSPORTATION CO.'S
MOTION TO DISMISS**

I.  <u>INTRODUCTION</u>

    Boston Towing & Transportation Co., Inc. ("BTT") brings its motion pursuant to 28 U.S.C. § 1927 ("§ 1927") and, though no rule is cited, Plaintiff ("Sinatra") must presume that use of the term "Compel" in a discovery dispute refers to Fed.R.Civ.P. 37.  Neither is appropriate here.

    In attempting to negotiate the terms of the proposed Independent Medical Examination ("IME"), Sinatra's counsel has behaved appropriately and has not "multiplie[d] the proceedings . . . unreasonably and vexatiously" so as to trigger sanctions under § 1927 or any of the Federal Rules of Civil Procedure.  *See* 28 U.S.C. § 1927.  Sinatra's attempt to negotiate has, in fact, been well within the scope of Fed.R.Civ.P. 35(a) (the rule governing the "Physical and Mental Examinations of Persons") and Fed.R.Civ.P. 26(b)(2) (the rule governing "Discovery Scope and Limits" that also provides for cost-shifting).  Sinatra further relies upon Rule 26(b)(2)(iii)'s

provision that the court may act upon reasonable notice without the need for Sinatra to file an additional request for a Protective Order under Rule 26(c).

Counsel for Sinatra is deeply disturbed by the instant discovery dispute in that the local admiralty practitioners have always prided themselves on their general ability to cooperate in voluntary and informal discovery. This firm cannot recall the last time it was forced to partake in a dispute such as this.

On the same token, however, BTT has behaved in the exact manner for which it now pursues sanctions. Unlike BTT's motion, Sinatra's counsel shall herein support their efforts to negotiate by citing to the relevant law, our court's interpretation of the Rules, and the whole facts as they exist rather than the spin on excerpts offered by BTT.

Pursuant to Fed.R.Civ.P. 26(b)(2) and 35(a), Sinatra requests that this court deny BTT's Motion to Dismiss and either rule that the IME be scheduled within fifty miles of his home or, in the alternative, that the defendant pay the reasonable transportation expense necessary for Sinatra to appear in Quincy, MA.

II. BACKGROUND OF THE CASE

Sinatra was injured on November 14, 2002 while employed by Camin Cargo Control out of Chelsea, Massachusetts as a fuel gauger. Camin had hired the TUG ETHEL TIBBETTS to transport Sinatra and his manager nine miles off the coast of Massachusetts to the TANKER MOUNTAIN LADY. Though BTT states that Sinatra was a "seaman", and as much as Sinatra would love to avail himself of the Jones Act, he was not a seaman. *See* Motion to Dismiss at 1. In fact, he was far from it: November 14, 2002 was *the first time* Sinatra had been out on the open ocean *in his entire life*.

2

At the time of his injury Sinatra was being transferred from the Tug to the Tanker by way of what the Coast Guard Incident Report termed a "non-maritime ladder" that had been supplied by the Tug and slapped against the rail of the Tanker by the Tug's crew. As the vessels began to shift in the nearly six foot swells, the ladder started slipping and Sinatra, who had not been provided a life jacket, was forced to fling himself over the Tanker's railing for risk of falling into the sea. As a result of the Tug's failure to provide a safe means of ingress and egress for their passenger-for-hire, Sinatra was caused to fall and strike his back against the Tanker's rail injuring him.

Upon the conclusion of discovery, Sinatra will be filing Motions for Summary Judgment against both defendants regarding liability and causation and shall prove that

1. the Tug violated several safety regulations and shall very likely include a claim for spoliation regarding the ladder that BTT has all but stated his client no longer has; and

2. the Tanker violated three international treaties and several safety regulations.

Further, since both defendants are in violation of safety regulations, and since this is a maritime case, comparative negligence, if any, shall not be a factor.

III. BACKGROUND OF THIS DISPUTE

On March 26, 2006 BTT filed a Motion to Dismiss or, in the alternative, to Compel Sinatra's attendance at an IME.

A.

Brief History of Communications:

1. On March 14, 2006, BTT faxed Sinatra a notification that they had scheduled an IME for May 8, 2006 in Quincy, MA. *See* BTT Fax attached as Exhibit A.

2. Within an hour, Sinatra replied informing counsel that he had moved to Bar Harbor, ME and requested that they either select a doctor within fifty miles of his new home or kindly pay his "reasonable transportation expenses" to and from their choice of doctor in Quincy. *See* Sinatra's Letter attached as Exhibit B.

3. The next morning, BTT replied that they "haven [sic.] intention of paying Mr. Sinatra anything for attending the scheduled IME." *See* March 15, 2006 Email attached as Exhibit C.

4. The next day, Sinatra in a good-faith, "last-ditch effort", compiled a detailed explanation with supporting documentation attached, of the two scenarios under which he would voluntarily attend an IME. *See* Sinatra's March 16, 2006 Letter attached as Exhibit D.

5. Soon thereafter, BTT refused Sinatra's attempt to negotiate by stating that Sinatra was "wasting [his] time taking frivolous positions"; an example of what has become BTT's standard form of communication. The court will note the repeated use of the terms "frivolous", "unnecessary litigation", "no basis", "wrongful claim", "delay" and multiple Rule 11 threats.[1] *See* BTT email attached as Exhibit E.

6. That evening, Sinatra replied by expressing his concern that all good faith efforts to negotiate were being met with accusations of frivolity and invited counsel to bring

---

[1] As this court is aware, the threat of Rule 11 is itself a violation of Rule 11. From his response to our Settlement Proposal to the instant discovery dispute, BTT has repeatedly used Rule 11 as an attempt to intimidate Sinatra. If the hearing requested *infra* is allowed, Sinatra asks that this court address such ill-advised behavior. An example is attached as Exhibit G.

4

his motion and stated that he looked forward to arguing such motion in court.

*See* Sinatra's Email attached as Exhibit F.

As evidenced by even a cursory overview of the attached communications, plaintiff's counsel has acted professionally and with an eye towards negotiating a fair and amicable agreement as to where the IME should be conducted. On the other hand, BTT has been anything but professional and quite unwilling to negotiate at all.

IV. <u>LAW AND ARGUMENT</u>

From BTT's Motion to Dismiss, Sinatra has been able to cull out the following three claims and/or arguments:

1) "parties are required to bear their own costs and expenses of litigation" otherwise known as the "American Rule";

2) Sinatra has "so multipli[ed] the proceedings in [this] case unreasonably and vexatiously" so as to warrant sanctions under § 1927; and

3) Sinatra has acted in "bad faith" so as to warrant an award of fees.

The current dispute is easily broken down into "**Inapplicable**" and "**Applicable**."

   A. <u>INAPPLICABLE</u>

      **1. The American Rule**

Without naming it as such, BTT relies upon the "American Rule" in his assertion that Sinatra is "required to bear [his] own costs and expenses of litigation." *See* Motion to Dismiss at 6. In support of this proposition, BTT cites to a 1985 bankruptcy case titled <u>Matter of Boston and Maine Corp.</u>, 51 B.R. 995 (D. Mass. 1985).

This case is not a fair representation of the facts or issues now before this court and is inapplicable for the following reasons:

1) The issue before the **Bankruptcy Court** in <u>Matter of Boston</u> was regarding the determination of reasonable compensation, *in the form of attorney's fees*, for actual and necessary services; and

2) The American Rule that "the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser" was employed by the Bankruptcy Court with an eye on *attorney's fees only*. Sinatra <u>never</u> sought to recover attorney's fees related to the proposed IME.

In <u>Matter of Boston</u> the court held that where fee petitions were of no benefit to the estate, counsel for the estate was not entitled to the allowance of compensation from that estate. *See* <u>Matter of Boston and Maine Corp.</u>, 51 B.R. 995, 998 (D.Mass. 1985). The court was <u>not</u> deciding whether to allow cost-shifting under Fed.R.Civ.P. 26(b)(2), argued *infra*, nor was it deciding anything even loosely related to discovery. BTT cites to this case only for its rigid application of the American Rule. *See* <u>Matter of Boston</u> at 999.

Had BTT continued his analysis, it would have revealed that <u>the very next year</u>, *the same court* declined to follow <u>Matter of Boston</u> saying that the prior opinion went "too far" and that compensation should be allowed where extra work is required.  *See* <u>In re Whet, Inc.</u>, 61 B.R. 709, 712 (D.Mass. 1986).

Since BTT's case law has nothing to do with Fed.R.Civ.P. 26(b)(2) cost-shifting or Fed.R.Civ.P. 35 disputes over IMEs, Sinatra ceases his analysis here as the furtherance of such would lead this court down the wrong path.

Though merely tangential to BTT's reliance on <u>Matter of Boston</u>, a more relevant citation would have been to <u>Alyeska Pipeline Service Company v. The Wilderness Society</u>, the U.S. Supreme Court case from which <u>Matter of Boston</u> cites the "American Rule."  *See* <u>Alyeska Pipeline Service Company v. The Wilderness Society</u>, 421 U.S. 240, 247 (1975).

The American Rule arises out of <u>Arcambel v. Wiseman</u> where, in 1796, the U.S. Supreme Court overturned an award of counsel fees on the ground that "[t]he general practice of the United States is in op[p]osition to it."  *See* <u>Alyeska</u> at 249 *citing to* <u>Arcambel v. Wiseman</u>, 3 U.S. 306 (1796).  "Thus, the Court recognized the 'American [R]ule' that attorney's fees ordinarily are not among the costs that a winning party may recover."  *See* <u>Roadway</u> at 759 *citing to* <u>Fleischmann Distilling Corp. v. Maier Brewing Co.</u>, 386 U.S. 714, 717-718 (1967).

It should be noted that though the <u>Alyeska</u> Court did not "assess the merits or demerits of the 'American Rule' with respect to the allowance of attorneys' fees", it did state that "[The American Rule] has been criticized in recent years, and courts have been urged to find exceptions to it."  *See* <u>Alyeska</u> at 270.

### 2.  28 U.S.C. § 1927

History

"Congress enacted the first version of § 1927 in 1813.  It was drafted by a Senate Committee appointed 'to inquire what Legislative provision is necessary to prevent multiplicity of suits or processes, where a single suit or process might suffice . . .'"  *See* Roadway Exp., Inc. v. Piper, 447 U.S. 752, 759 (1980) *citing to* 26 Annals of Cong. 29 (1813).

The Standard

> The First Circuit does not require a showing of attorney's subjective bad faith to meet the [§] 1927 standard.  Instead, sanctions may be appropriate under § 1927 if an attorney's conduct is 'unreasonable, harassing or annoying' judged from an objective standard, whether or not the attorney intends to harass or annoy.  To be vexatious under [§] 1927, however, the attorney's conduct must 'be more severe than mere negligence, inadvertence, or incompetence.'  *See* McClane v. Rechberger, 280 F.3d 26, 44 (1st Cir. 2002) *quoting* Cruz v. Savage, 896 F.2d 626, 632 (1st Cir. 1990).

Our appellate court "accord[s] 'extraordinary deference' to a district court's decision to deny sanctions."  *See* McClane at 44 *citing to* Dubois v. United States Dep't of Agric., 270 F.3d at 80 (1st Cir.2001) *quoting* Lichtenstein v. Consolidated Servs. Group, Inc., 173 F.3d 17, 22 (1st Cir.1999).  The responsibility for imposing sanctions "properly rests with the judicial actor closest to the litigation – the district court judge – who is in the best position to evaluate the circumstances surrounding an alleged violation and render an informed judgment."  *See* McClane at 44 *citing to* Cruz at 632.

BTT has failed to establish that Sinatra's attempt to negotiate an amenable IME was

vexatious, unreasonable, harassing or annoying.  Further, BTT has not identified a single instance where the attorney for the plaintiff has engaged in "intentional misconduct that was in disregard of the orderly process of justice."

### 3. Bad Faith

In addition to seeking sanctions under § 1927, BTT also seeks sanctions pursuant to the court's "inherent power to sanction where a party acts in bad faith."  *See* Motion at 8.  In support of its request, BTT cites to Chambers v. NASCO, Inc.  *See* Id.  As with Matter of Boston, BTT cited, but did not analyze the law it proffered.  In Chambers, the U.S. Supreme Court held *inter alia* that "a court may assess attorney's fees when a party has 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons.'"  *See* Chambers v. NASCO, Inc., 501 U.S. 32, 46 (1991) *citing to* Alyeska at 258-259 *quoting* F.D. Rich Co. v. United States ex rel. Industrial Lumber Co., 417 U.S. 116, 129 (1974)).  *See also* Hall v. Cole, 412 U.S. 1, 5 (1973); Newman v. Piggie Park Enterprises, Inc., 390 U.S. 400, 402, n. 4 (1968) (*per curiam*).

The Chambers Court further held that "[I]f a court finds 'that fraud has been practiced upon it, or that the very temple of justice has been defiled,' it may assess attorney's fees against the responsible party (*citing to* Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 580 (1946)), as it may when a party 'shows bad faith by delaying or disrupting the litigation or by hampering enforcement of a court order.'"  *See* Chambers at 46 *citing to* Hutto v. Finney, 437 U.S. 678, 689, n. 14 (1978).

Other than its usual pontifications that "there is no legal basis," "contradicts rules of discovery," "bad faith," "baseless demands," etc., BTT has failed to apply a shred of law, cite a single rule, or specify any evidence in support of its repeated allegations.  In fact, its reliance

9

upon Chambers runs contra positive to its pursuit of sanctions.  Specifically, BTT's inability to show how or even that Sinatra has acted "in bad faith, vexatiously, wantonly, or for oppressive reasons" or that "fraud has been practiced upon [this court]" or that Sinatra has "delay[ed] or disrupt[ed] the litigation or [] hamper[ed the] enforcement of a court order" has demonstrated only the manners in which it has violated the same law it seeks to wage against Sinatra.

For the reasons stated above, Sinatra requests that BTT's Motion be denied, that the defendant either schedule an IME within fifty miles of Sinatra's home or pay the reasonable transportation expenses necessary, as set forth *supra*, for Sinatra to appear at the requested IME.

B. APPLICABLE

1. **Fed.R.Civ.P. 35(a)**

Rule 35 provides that when the physical condition of a party is in controversy, the court may order the party to submit to a physical examination but only on motion and for good cause shown.  *See* Fed.R.Civ.P. 35.

Though "[t]echnically, a request for examination must be made by motion, with a proposed order attached," IMEs are typically arranged by consent.  *See* Baicker-McKee, Federal Civil Rules Handbook, Author's Commentary on Rule 35, 716 (2006) *citing to* Smith v. Koplan, 215 F.R.D. 11, 12 (D.D.C. 2003).

Sinatra made a good-faith effort to negotiate an amenable agreement as to the costs and locale of the requested IME.  *See* Exhibits B and D.  BTT refused to negotiate.  *See* Exhibits C and E.  Since the parties were unable to consent to an amenable arrangement, BTT's remedy is provided by Rule 35 – **NOT** the American Rule, § 1927, or Chambers.

In an effort not to duplicate the materials offered here in opposition, Sinatra summarizes the scenarios he offered BTT:

Scenario 1   Sinatra, in an effort to keep it simple, offered to appear at the proposed IME so long as the defendant was willing to pay Sinatra $200.00, in a check "made payable to James Sinatra" to cover his "reasonable transportation expenses to and from the examination." *See* Exhibit B.

Since the first scenario was flatly rejected, Sinatra offered the detailed explanation contained in Exhibit D and offered the following two options:

Option I   Please schedule the IME with a doctor of your choosing within one hour and/or 50 miles of Bar Harbor, Maine. Our client shall be made available at the date and time you require.

Option II   We are willing to make our client available in Quincy pursuant to the following terms:

1. Please have the start time changed to 1 p.m. or later so that our client can make the 7+ hour drive without having to leave prior to 6 a.m.

2. Pursuant to the Federal Rules of Civil Procedure, state the conditions and scope of the examination.

3. Kindly stipulate that the only parties that shall be present at the examination will be our client and your doctor.

4. Send us a check made payable to our client in the amount of $200 to cover his travel expenses. Please keep in mind that this sum is more than fair. If we were to apply the GSA's Privately Owned

11

        Vehicle Mileage Reimbursement Rate, currently $0.445 per mile, the total sought would be $277.24 ($257.24 for mileage plus $20 for tolls). *See* GSA Rates attached as Exhibit C.

5. We do not seek reimbursement for food or lodging as our client has a friend he can convalesce with overnight.

*See* Exhibit D.

### 2. Fed.R.Civ.P. 26(b)(2)

Rule 26(b)(2) authorizes this court to limit the use of a discovery method if it is determined that:

(i)   "the discovery sought . . . is obtainable from some other source that is more convenient, less burdensome, or less expensive"

AND to shift the costs of discovery where

(iii)   "the burden or expense of the proposed discovery outweighs it likely benefit, taking into account . . . the parties' resources." See Fed.R.Civ.P. 26(b)(2)(iii)."

*See* Fed.R.Civ.P. 26(b).

    Rule 26(b) also *merges* with Rue 26(c) to allow this court to "act upon its own initiative after reasonable notice" to "make any order which justice requires to protect a party or person from . . . oppression, or undue burden or expense, including . . .:

1. That the disclosure or discovery not be had;

2. that the disclosure or discovery may be had only on specified terms or conditions, including a designation of the time or place; and

    3. that the discovery may be had only by a method of discvery other than that selected by a party seeking discovery." *See* Fed.R.Civ.P. 26(b) and 26(c).

Given the following circumstances taken from Exhibit D and in light of the above-stated rules, either of the "Options" proposed by Sinatra in Exhibit D may be ordered by this court:

<u>Circumstances</u>:

1. Two examinations of the same injury have already been conducted by suitably licensed and certified examiners – an insurance defense examination as recently as September 26, 2005.

2. On February 25, 2006, due to financial hardship, our client was forced to move to Bar Harbor, Maine. As a result, our client currently lives 289 driving miles from your examiner – round-trip, that equates to a 10 hour and 40 minute drive across 578 miles. *See* MapQuest Driving Directions attached as Exhibit B [art of this Opposition's Exhibit D].

3. Our client continues to experience quite a bit of back pain and cannot drive more than one hour without having to take a break. This necessity increases the 10 hour and 40 minute trip into a 15+ hour ordeal. This requires an overnight stay.

4. Our client remains unemployed and, as a result, does not have the financial resources to make the [proposed] trip [].

5. Equally qualified examiners are readily available within fifty miles of Bar Harbor, Maine. The selection of such an examiner local to our client would be more convenient, less

burdensome and less expensive – AND even more independent than the doctor [] currently propose[d].

In response to BTT's claim that an IME in Bar Harbor would result in BTT "incurring additional and unnecessary costs associated with the physician's appearance at the time of the trial" Sinatra states that the $277.24 requested pursuant to Rule 26(b)(2) in "Option II" *supra* is the simplest solution.

Finally, in response to BTT's claim that Sinatra's selection of this forum should bind him to it for all proceedings is inaccurate. Unlike Sinatra's deposition and the pending trial, the IME involves the physician and Sinatra – NO ONE ELSE. Therefore, the locale of the IME is irrelevant to the forum selected by him for the bringing of his suit.

V. CONCLUSION

Pursuant to the above, Sinatra requests that this court deny BTT's Motion to Dismiss and deny BTT's requests for sanctions. In addition, Sinatra requests that this court order that the proposed IME go forward as set forth in either of the "Options" proposed by him in good faith. Last, and in light of the unnecessary discovery dispute now before the court, Sinatra requests that this court award any sanctions that it may see fit as against BTT in the hope that it may dissuade his behavior during the remainder of this litigation.

**REQUEST FOR ORAL ARGUMENT**

The Plaintiff requests oral argument on this motion pursuant to L.R. 7.1(D)**.**

Respectfully submitted,
James Sinatra,
By his attorney,

/s/ David B. Kaplan_____
DAVID B. KAPLAN
**THE KAPLAN/BOND GROUP**
88 Black Falcon Avenue, Suite 301
Boston, Massachusetts 02210
(617) 261-0080
B.B.O. No. 258540


Dated: April 11, 2006